# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REGINALD J. ROUNTREE,                      :
                                           :
            Plaintiff,                      :
                                           :
      v.                                   :        Civil Action No. 04-806 (ESH)
                                           :
MIKE JOHANNS, Secretary,                   :
Department of Agriculture,                 :
                                           :
            Defendant.                     :
_____:

## MEMORANDUM OPINION

Plaintiff, a twenty-three year African American veteran of the Department of Agriculture ("USDA"), alleges that his employer discriminated on the basis of race and gender, retaliated against him and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*  Plaintiff also seeks review pursuant to the Civil Service Reform Act, 5 U.S.C. § 7703(b)(2), of the Merit Systems Protection Board ("MSPB") decision upholding his removal from office.  The Secretary has moved for summary judgment.  As explained herein, the motion is granted in part and denied in part.

## BACKGROUND

Rountree joined USDA in 1981 after graduating from college.  He gradually worked his way up to GS-12 Senior Loan Specialist with the Farmers Home Administration in Washington, D.C.  In 1994, following a successful EEO complaint, plaintiff was placed in the Executive Management Potential Training Program for one year, and thereafter, from 1995 until 2003,

Rountree served in Richmond as GS-13 Program Director for USDA's Rural

Business/Cooperative Services Programs ("RBS").  In that position, Rountree's role was to foster

economic development in rural Virginia by extending loans for business development.  (Def.'s

Ex. 33 at 89-93; Pl.'s Ex. 6.)

　　On October 31, 2001, USDA Rural Development's Virginia State Director, Joseph

Newbill, terminated a RBS probationary employee, Princess Prince.  She had worked closely

with Rountree, and upon her termination, Rountree wrote Newbill that "even though the . . .

termination of Princess Prince . . . was during the probationary period and required no

justification, . . . you do not have the right to subject my staff and/or me to undue harassment or a

hostile working environment . . . ."  (Def.'s Ex. 2 (Rountree's 11/15/05 letter to Newbill).)

Rountree also complained about Newbill's investigations of himself and his staff for abuse of

travel reimbursements, compensatory time, government car usage, etc.  Although Rountree

acknowledged that Newbill, as State Director, has a "right and privilege" to pursue "alleged

abuse," plaintiff contended that the allegations were baseless and that "if the truth was known,

[the persons making the allegations] themselves are guilty of what they have alleged of others."

(*Id.*)

　　On November 7, 2001, Bertha Cook, a GS-6 Technician whom Rountree supervised,

requested reassignment away from plaintiff because of a work environment of "continuous

hostility" in which she was "dominated" by plaintiff, resulting in "extreme stress that makes it

difficult to be able to function to the best of my ability."  (Def.'s Ex. 3.)  Rountree had apparently

castigated Cook that day for not telling plaintiff that his personal friend had stopped by while

plaintiff was out, even though the friend had not asked her to pass on such a message.  Rountree

2

told Cook that "she had been a problem employee for some time."  (*Id.*)  Newbill granted Cook's request, transferring her to another division.

Newbill had previously relayed to Rountree the concerns of plaintiff's subordinates that "they felt they were oppressed by [Rountree] and are in a constant state of fear of being subjected to reprisal and retaliation."  (Def.'s Ex. 2 (Rountree's 11/15/05 letter to Newbill, discussing conversations between the State Director and plaintiff on 10/26/01 and 11/14/01).)  On December 3, 2001, Newbill asked the USDA Field Services Branch ("FSB") to investigate Cook's allegation that plaintiff created a hostile work environment and showed favoritism towards Prince, allowing her to come in late and then going out to breakfast with her without taking leave time.  A FSB investigator from St. Louis (Alice Green) took sworn statements from numerous subordinates of plaintiff, and on April 9, 2002, she submitted her report that substantiated the hostile work environment allegation, finding that he brokered no criticism, that he was openly hostile to his subordinates, that he belittled "anyone brave enough to offer their input," and that he was alleged to "pit his employees against each other . . . question[ing] his employees if they were seen talking to another employee that he didn't like."  She advised the State Director that he needed to decide "if discipline is appropriate and if it is in the best interest of the Agency for Mr. Rountree to continue working in a supervisory position."  (Def.'s Ex. 5 at 19.)

Meanwhile, Newbill had received complaints from Rountree's customers about plaintiff's treatment of them and his job competency.  On March 15, 2002, a Virginia State Senator wrote Newbill that a constituent had been told by Rountree that the constituent's loan was being rejected because the applicant "had gone over [Rountree's] head" by contacting his State Senator,

who in turn had earlier inquired about the matter with Newbill.  (Def.'s Ex. 8.)  On July 2, 2002, the Westmoreland County Administrator wrote Newbill "the first letter I've written concerning the performance of an employee of any state or federal agency in twenty-one years of service as a county administrator."  The Administrator said that Rountree "does not either have a solid grasp of the programs within his department or simply cannot articulate the application of those programs to the local level."  (*Id.*)  On July 22, 2002, the Risk Management Officer for Farm Credit sent a similar letter, complaining that Rountree told him "that [he] could not contact higher ranking officials in USDA or congressional representatives," and further lamenting the lack of any "attempt on the part of USDA to explain the process that was so rigorously followed," as well as "[t]he perceived attitude that every roadblock possible would be used throughout the process."  (*Id.*)

Shortly thereafter, on August 20, 2002, Newbill proposed demoting plaintiff and reassigning him to a local office elsewhere in Virginia.  He based the proposal on Rountree's inappropriate conduct toward other USDA employees, as well as members of the public.  Pending a final decision on the demotion, Rountree was to remove all his personal effects from his office that day, was given one day of administrative leave to "make necessary arrangements," and was to report on August 22 to a GS-13 nonsupervisory position with the Rural Business staff in Washington, D.C.  (Def.'s Ex. 9.)

On August 21, plaintiff received a faxed travel authorization allowing him to drive from Richmond to Washington on Mondays, stay in Washington for the week, and then return to Richmond on Friday afternoons.  (Def.'s Ex. 11 (travel authorization).)  However, plaintiff

maintains that before he received the fax, he had already signed a lease and paid cash for a one-bedroom basement apartment in Woodbridge, Virginia, for $4500 per month.  (Def.'s Ex. 33 at 142-45; Pl.'s Exs. 7-9.)  Plaintiff, however, never occupied the unit that he had rented from Ronald Pope, a business associate (Def.'s Ex. 33 at 140-41; Pl.'s Ex. 9), and indeed, reported for less than two full days of work in Washington before taking seven months of administrative, annual, and sick leave.  (Compl. ¶ 14; Def.'s Ex. 33 at 204-05.)  On October 11, 2002, Rountree submitted a travel voucher seeking reimbursement for $4801.15 in expenses incurred during his 1.75 day detail in August, including the lease for the Woodbridge apartment.  (Def.'s Ex. 14, Enclosure 1.)  Because of the "amount and unusual nature of [Rountree's] request for travel reimbursement," on October 29 Newbill informed plaintiff that he had requested that the USDA Office of the Inspector General ("OIG") look into the matter.  (Def.'s Ex. 16.)

Similarly, on October 17, 2002, Newbill informed Rountree that plaintiff's government credit card contained questionable charges.  (Def.'s Ex. 15.)  The OIG also investigated this alleged misuse and documented numerous instances when Rountree's card had been improperly used for personal transactions.  (Def.'s Ex. 28.)  Rountree explained that the "card has been used on numerous occasions without my knowledge by a relative who had access to my card and PIN number," and he pledged to safeguard the card in the future.  (Def.'s Ex. 15.)

Nonetheless, on November 22, 2002, based on the OIG Special Agent's swearing out of two criminal affidavits, plaintiff was arrested in Virginia on state charges of felony embezzlement and felony credit card fraud involving $5322 in questionable credit card charges from December 18, 2000 to January 31, 2002.  (Def.'s Ex. 18 at 9, Ex. 32 at 109-110.)  Ultimately, one of these charges was *nolle prosequied* and the other was dismissed, in part

because the presiding state court judge believed the matter belonged in federal court.  (Def.'s Exs. 31, 32 at 110-11.)

On January 16, 2003, Newbill withdrew the proposed demotion of Rountree and replaced it with a removal proposal.  He based the proposed action on plaintiff's submission of a false travel voucher, misuse of his government credit card, deficient service to customers, an appearance of favoritism towards Prince, and the creation of an uncomfortable and tense working environment.  (Def.'s Ex. 14.)  The matter was then the subject of a full administrative process and based on the report and recommendation of Scarlett L. Smith, a Human Resources Specialist, the USDA Rural Development Deputy Administrator for Operations and Management in Washington, D.C., Shirley Hinton Henry, decided that removal was warranted.  (Def.'s Exs. 17, 18.)  At a result, plaintiff's tenure with USDA ended on September 5, 2003.

Rountree initially alleged discrimination against him by Newbill in a letter to the USDA Director of Civil Rights on February 1, 2002.  (Def.'s Ex. 20.)  Plaintiff ultimately filed a formal discrimination complaint on November 8, 2002, and the agency agreed to investigate whether it "subjected the Complainant to harassment based [on] race (African/American), sex (male), and reprisal (for prior EEO activity)."  (Def.'s Ex. 24 at 3-4.)  On July 7, 2004, the Office of Civil Rights rejected plaintiff's claim.  (*Id.* at 14.)

Plaintiff also appealed his termination to the MSPB.  After an evidentiary hearing on March 2-3, the Administrative Judge sustained the penalty of removal in her Initial Decision, issued on March 26, 2004.  (Def.'s Ex. 25 (MSPB Initial Decision).)  This decision became final on April 30, 2004.

Rountree has now sued alleging race and sex discrimination and retaliation in violation of Title VII and attacking the decision of the MSPB on the grounds that it was arbitrary, capricious, and unsupported by substantial evidence.  Plaintiff seeks retroactive reinstatement, back pay, expungement of negative information from agency records, and compensatory damages.  (Compl. at 9-10.)

## ANALYSIS

The Secretary argues that summary judgment in his favor is warranted because plaintiff cannot make a prima facie case of discrimination or of retaliation, or, alternatively, because defendant had legitimate business reasons for its actions and plaintiff cannot prove that those reasons are pretextual.  Defendant also seeks affirmance of the MSPB decision.

## I.      Legal Standard

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255; *see also Wash. Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The nonmovant's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The nonmovant must provide evidence that would

permit a reasonable jury to find in his favor.  *Laningham v. United States Navy*, 813 F.2d 1236,

1241 (D.C. Cir. 1987).  "If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

"While summary judgment must be approached with special caution in discrimination cases, a

plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other

competent evidence showing that there is a genuine issue for trial."  *Calhoun v. Johnson*, No.

95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd*, 1999 WL 825425 (D.C. Cir.

Sept. 27, 1999) (citation omitted).

## II.     Plaintiff's Discrimination Claim

Plaintiff bears the initial burden of presenting a prima facie case of discrimination.  To do

so, Rountree must show that "(1) []he is a member of a protected class; (2) []he suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of

discrimination."  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  If he sustains this burden,

the Secretary must articulate a legitimate, nondiscriminatory basis for his action.  *Thomas v.

Nat'l Football League Players Ass'n*, 131 F.3d 198, 202 (D.C. Cir. 1997), *vacated in part on

other grounds*, 1998 WL 1988451 (D.C. Cir. 1998) (citing *Tex. Dep't of Cmty. Affairs v.

Burdine*, 450 U.S. 248, 255 (1981)).  The burden then shifts to the plaintiff to demonstrate that

defedant's reason is pretextual.  *Id.*

A.      **Plaintiff's prima facie case**

There is no dispute that Rountree is a member of a protected class.  Further, the Court

agrees with plaintiff that a reasonable jury could conclude that he suffered several adverse

actions.

First, Rountree was terminated, which undoubtedly had "materially adverse consequences

affecting the terms, conditions, or privileges of [his] employment or [his] future employment

opportunities." *Brown*, 199 F.3d at 457.  Second, plaintiff was arrested on charges of

perpetrating fraud on the government.  Third, a jury could reasonably find that plaintiff suffered

an adverse action when, on August 20, 2002, Newbill gave Rountree two days' notice to report to

an indefinite, nonsupervisory detail, hours away in Washington, D.C.  Although an involuntary

detail standing alone does not constitute an adverse action, *see Ware v. Billington*, 344 F. Supp.

2d 63, 74 (D.D.C. 2004), it may become one where there are "materially adverse consequences."

*Brown*, 199 F.3d at 457.[1]  A factfinder could determine that the transfer of plaintiff to a new job

away from his home where he would be stripped of his supervisory responsibilities and would

have undefined "responsibilities [and] stature," *Childers v. Slater*, 44 F. Supp. 2d 8, 21 (D.D.C.

1999), is an adverse action for Title VII purposes.

_____

[1] Defendant miscites *Brown* for the proposition that plaintiff cannot show an adverse
employment action absent a "tangible economic effect on plaintiff."  (Def.'s Reply at 4.)  That is
not the law.  Rather, the very quotation defendant cites to support this proposition actually refutes
his argument. *See Brown*, 199 F.3d at 456 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S.
742, 761 (1998)) ("A tangible employment action constitutes a significant change in employment
status, such as hiring, firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in benefits.") (internal quotation marks
omitted).

Being mindful that plaintiff's burden at this stage is not great, and because the evidence relied on to justify defendant's actions is also relevant to the third prong of plaintiff's prima facie case, the Court may assume that a prima facie case has been established as to the above three actions and proceed to analyze whether defendant has met his burden of demonstrating that his actions were based on legitimate, nondiscriminatory reasons and whether plaintiff has demonstrated that these reasons are pretextual. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 993 & n.6 (D.C. Cir. 2002).[2]

Defendant offers legitimate, nondiscriminatory reasons for each of the three adverse actions at issue here. First, as to plaintiff's detail to Washington, D.C., in August 2002, Newbill justified this action in an eighteen-page, single-spaced letter that carefully explained the evidence supporting the conclusion that plaintiff had acted inappropriately toward six subordinates, as well as one co-worker whose office was down the hall from Rountree's. (*See* Def.'s Ex. 9.) Newbill also specified the bases for his findings that plaintiff had treated five members of the public inappropriately. (*Id.*; *see also* Def.'s Ex. 8.) In particular, he relied on the USDA FSB investigator's April 2002 report that substantiated the charges of a hostile work environment

---

[2] Although defendant seeks to refute various other purported adverse actions, these three are the only ones plaintiff relies on in his opposition to summary judgment. (*See* Pl.'s Opp'n at 30-31.) This apparent concession is understandable, since Newbill's referral of the harassment charge to the FSB for investigation and the referral of the credit card misuse and false travel voucher to the OIG are not adverse actions. *See Ware v. Billington*, 344 F. Supp. 2d at 76; *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001), *aff'd*, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001) ("[M]ere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effects on plaintiff's employment.").

created by Rountree by reference to six detailed statements of those who worked for Rountree, as well as a co-worker.  (*See* Def.'s Ex. 5.)

As for plaintiff's arrest, it is uncontested that this occurred as a result of two criminal affidavits sworn to by Senior Special Agent Debra Thomerson Dreisbach, who worked for the King of Prussia Field Office of Investigations of the USDA's OIG.  (*See* Def.'s Ex. 28.)  After conducting an investigation, she concluded that Rountree had misused his government credit card by improperly charging $5,322.42 and had submitted a fraudulent travel voucher claim.  As a result, she made out two criminal affidavits charging the plaintiff with felony credit card fraud and felony embezzlement.  (*Id.*; *see also* Def.'s Ex. 18.)

Finally, with respect to plaintiff's removal, which was officially proposed by Newbill on January 16, 2003 (Def.'s Ex. 14), the decision to terminate Rountree was made by the Deputy Administrator for Operations and Management, Sherie Hinton Henry, on August 11, 2003, based on the recommendations of Scarlett Smith, Human Resources Specialist (Def.'s Ex. 18), and Newbill.  (Def.'s Ex. 14.)  The decision was based on five independent bases, including travel fraud, misuse of a government credit card, deficient service to members of the public, the creation of the appearance of giving preferential treatment to Princess Prince, and the creation of a tense and uncomfortable working environment.  (Def.'s Exs. 17 and 18.)

Since the government has articulated legitimate reasons for each of its actions and proffered evidence in support thereof, the Court proceeds to the issue of whether plaintiff has shown "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Burdine*, 450 U.S. at 253 (citations and internal quotation marks omitted).  In addressing this question, the Court is mindful that just as an employer's reason need

not be false to be proven pretextual, it is also true that if an employer's reason is false, this may

not be sufficient to prove pretext because

> an employer's action may be justified by a reasonable belief in the
> validity of the reason given even though that reason may turn out to be
> false. *See Fischbach v. D.C. Dep't of Corr*., 86 F.3d 1180, 1183 (D.C.
> Cir. 1996) ("Once the employer has articulated a nondiscriminatory
> explanation for its action . . . the issue is not the correctness or
> desirability of the reasons offered but whether the employer honestly
> believes in the reasons it offers.

*George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (internal quotation marks and alterations

omitted).

In response, plaintiff argues that these justifications are pretextual, and that Newbill was

motivated by discriminatory animus as evidenced by his different treatment of a white manager

(Carlton Jarratt) who was detailed to a more convenient location, as well as by Newbill's alleged

pattern of treating black employees less favorably in general.  (Pl.'s Stmt. at 2-3; Pl.'s Opp'n at

32.)  As to the former, plaintiff has, however, failed to provide any competent evidence showing

that the white manager who was also detailed was similarly situated but differently treated.

Rountree must provide evidence that he "and the allegedly similarly situated . . . employee were

charged with offenses of 'comparable seriousness.'"  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.

Cir. 1999) (quoting *Lynn v. Deaconess Med. Ctr.-W*., 160 F.3d 484, 488 (8th Cir. 1998)).

Plaintiff has not done this.  Rountree provides only two sources of evidence about this

purportedly similarly situated USDA employee.  The first is a memo that does not even include

the manager's name and which simply states that a telecommuting proposal was approved; it

does not mention any investigation or specify any infraction that was allegedly committed by the

manager.  (Pl.'s Ex. 19.)  The other source is Rountree's own testimony, which fails to provide

any detail about any charges against the white manager, but instead it focuses on the family considerations that purportedly informed the decision to allow the man to remain closer to Richmond. (Pl.'s Ex. 18 at 065, Def.'s Ex. 33 at 175-76.)  Reading the record in Rountree's favor, all he has shown is that another man with family concerns was detailed closer to home. Without evidence about the reasons for the detail or the nature of the alleged infractions, plaintiff has not carried his burden of showing that the other manager was in fact similarly situated. *See George*, 407 F.3d at 415-16 (holding that, where record evidence *specified* the comparative alleged infractions of the relevant individuals, but where the accuracy of those allegations was in genuine dispute, a court may not grant summary judgment).

As to Newbill's purported treatment of black employees less favorably in general, plaintiff's evidence likewise fails to raise an inference that Newbill was motivated by a discriminatory animus.  Plaintiff states that during Newbill's first two years as State Director, he fired four African Americans but no whites.  (Pl.'s Stmt. at 2.)  However, two of those terminated were probationary employees, one of whom was Prince.  The third was a longtime USDA employee who was fired for falsely reporting her attendance.  (Pl.'s Ex. 1 at 139-40.)  The fourth was Rountree.  Plaintiff argues that these terminations constitute a pattern that reflects a discriminatory animus toward African Americans.  However, plaintiff has failed to provide any comparative evidence indicating that similarly situated whites were treated differently; indeed, he has not even shown how many whites and African Americans worked for USDA in Virginia under Newbill's supervision.  Thus, this evidence provides no frame of reference to determine whether the terminations reflect a pattern or practice of discrimination.

13

Further, plaintiff complains that Newbill required more information from black managers than from their white counterparts before he granted cash awards requested by those managers. But the only black manager cited is Rountree himself.  (Pl.'s Stmt. at 3.)  Moreover, he cites one request only by another manager, whose race is not even identified.  (*See* Pl.'s Exs. 12, 13.) Thus, without any factual context, this contention is mere argument and does not suggest pretext. Similarly, his complaint that Newbill allowed whites to downgrade their subordinates, while blacks could not (Pl.'s Stmt. at 2-3) founders because plaintiff provides no evidence pertaining to any manager other than himself to support his generalization.  (*See, e.g.*, Def.'s Ex. 33 at 175.)

Plaintiff also makes much of the purportedly disputed fact of whether Newbill solicited complaints about plaintiff's treatment of his employees or whether subordinates came to Newbill in the first instance with their grievances.  (*See* Pl.'s Opp'n at 33.)  The record is clear that not every subordinate initiated a complaint with Newbill (*see, e.g.*, Def.'s Ex. 32 at 306 (Barbrow); Ex. 33 at 44 (Fulcher); *id.* at 69 (Michels); Pl.'s Ex. 15 at 209 (Tucker)), but it is equally clear that Rountree's secretary, Bertha Cook, did so in writing, which gave rise to the FSB investigation.  (*See* Def.'s Ex. 5 (Green's nineteen-page Report of Investigation).)  Regardless of whether Newbill's recollection of how many of Rountree's subordinates complained is accurate, there can be no doubt that he started the investigation based on Cook's complaint.  (*See* Def.'s Ex. 3 (Cook's 11/7/01 letter to Newbill).)  Based upon Cook's allegations, as well as Green's extensive investigation in support of her conclusion that Rountree created a hostile work environment, Newbill reasonably decided that it was necessary to remove plaintiff from a position where he could retaliate against the subordinates who had provided negative comments about Rountree to the investigator.  (*See* Pl.'s Ex. 1 at 87 (Newbill dep.) and Def.'s Ex. 5.)

14

Accordingly, contrary to plaintiff's argument (Pl.'s Opp'n at 34), this situation bears no

resemblance to *George*, 407 F.3d at 414, where there was a material issue of fact as to whether

subordinate employees had even complained about the terminated employee.  In contrast, in this

case there is no dispute as to whether the subordinates made their substantial concerns and fears

known (indeed, one of them cried while meeting with the investigator to discuss her treatment by

Rountree (Def.'s Ex. 5 at 18)), but rather only an irrelevant dispute regarding the number of

subordinates who complained in the first instance to Newbill.  Thus, this purported issue of fact

is immaterial, and it does not suggest a discriminatory animus by Newbill.

Further, the fact that Newbill referred Cook's hostile work environment complaint for

investigation by the FSB, notwithstanding Newbill's sense that Cook "maybe feared

Mr. Rountree perhaps because of his race" (Pl.'s Ex. 1 (Newbill dep.) at 76-77), does not indicate

an illegal animus, since Newbill could hardly ignore Cook's written allegation, regardless of the

State Director's surmise regarding the basis for Cook's fears.  (*Id.*)  Bringing in a neutral outside

investigator from FSB was a reasonable response to the complaint and cannot support an

inference of discrimination. Plaintiff therefore has failed to provide sufficient evidence to support

his argument that Newbill's justifications for recommending Rountree's termination or for

detailing him[3] were a pretext for discrimination.

---

[3] In fact, Newbill's nondiscriminatory explanation for the short-notice detail stands
unrefuted:  after giving plaintiff notice of his proposed demotion, which was based in large part
on the substantiated hostile work complaints of Rountree's subordinates, Newbill "did not want
[Rountree] there where he might be able to confront the subordinate employees and make life
tough for them."  (Def.'s Ex. 1 (Newbill dep.) at 87.)

In response, plaintiff argues that by the time of Rountree's detail, the hostile work
environment report was four months old, and the subordinates' underlying statements to the

Plaintiff fares no better in his attempt to impugn the motives of the others who were involved in his arrest and his termination.  With respect to the OIG Special Agent who referred the plaintiff for prosecution, while plaintiff challenges the Special Agent's findings (Pl.'s Stmt. at 5-6), he offers no evidence to suggest that the reasons given for his arrests were a pretext for discrimination.  On the contrary, the OIG investigator identified multiple instances of possible credit card abuse and a potentially fraudulent travel voucher.  (*See* Def.'s Ex. 28.)  Also, there is absolutely no evidence to suggest that Newbill instigated the referrals to the police, for even though he was the one who called for the original investigation, there is nothing to suggest that the agent's criminal referrals were motivated by anything other than her independent conclusion that plaintiff had possibly engaged in criminal conduct.  (*Id.*)  *See Velikonja v. Mueller*, 315 F. Supp. 2d 66, 81 (D.D.C. 2004).  It can thus be decided as a matter of law that the OIG Special Agent possessed a good faith belief in the reasons for her criminal referrals.  *See George*, 407 F.3d at 416.

Finally, a similar conclusion must be reached with respect to the individuals who were involved in the decision to terminate plaintiff.  The termination decision was ultimately made by a high-level Washington-based Administrator (Shirley Hinton Henry) based on the

_____

investigator were even older.  (Pl.'s Opp'n at 33.)  In plaintiff's view, this undercuts the reasonableness of Newbill's concern about retaliation against plaintiff's employees following the proposed demotion.  This argument is unpersuasive.  In light of Newbill's reliance on the numerous quotations from the subordinates' statements about Rountree (*see* Def.'s Ex. 9 (demotion proposal including thirteen pages of single-spaced quotations of staff statements about plaintiff)), it was entirely reasonable for the State Director to believe -- consistent with Rountree's past behavior as identified by the FSB investigator (*see* Def.'s Ex. 5) -- that plaintiff would treat his subordinates inappropriately once the demotion letter was issued, and he was informed of their accusations on August 20, 2002.  (Def.'s Ex. 9.)

recommendation of a Human Resources Specialist (Scarlett Smith).  (*See* Def.'s Exs. 17 and 18.)
As for Smith, plaintiff does no more than suggest that she is not credible because of a minor
inconsistency between her deposition testimony regarding her suspicions with respect to
Rountree's use of cash, as opposed to his government credit card, and USDA regulations, which
permit the use of cash for travel expenses under certain specified circumstances.  (*See* Pl.'s Stmt.
at 7; Pl.'s Ex. 14 at 765.)[4/]  Any such inconsistency is hardly a basis to cast doubt on the
motivation for her findings as to the allegedly false travel voucher, which were based on the OIG
Special Agent's factual findings and not on any misunderstanding as to the agency's regulations.
(*See* Def.'s Ex. 18.)

Similarly, with respect to Henry, plaintiff attempts to create an issue of fact based on her
testimony at the MSPB hearing regarding the lack of documentation supporting the Pope
transaction, and her recollection that she based her termination decision on three customer
complaints, whereas in fact, Smith had only substantiated two such complaints.  (*See* Pl.'s Stmt.
at 8.)  A review of the relevant portion of Henry's testimony makes clear that she did not testify,
as plaintiff claims, that there was no documentation that Rountree paid $4500 to Pope (*see* Def.'s
Ex. 32 at 225-26 (Henry testimony)), and whether she incorrectly recalled the number of
customer complaints sustained by Smith (*see id*. at 234-35) is of *no* consequence.  Finally,
plaintiff accuses Henry of creating a *post hoc* rationale for her termination decision, since she
testified at the MSPB hearing that she recently learned that the per diem rate for Woodbridge,

---

[4/]  Plaintiff also points to Smith's comments regarding Rountree's public support of
Prince's discrimination claim.  (Pl.'s Stmt. at 7.)  This, however, is relevant to the retaliation
claim (*see infra* Section III) and not the discrimination claim.

Virginia, where Rountree stayed prior to going on leave for seven months, is $84.00, and thus, Rountree improperly charged the daily rate for Washington, D.C. ($150.00).  (*Id*. at 226.)  Based on this, plaintiff illogically claims that "her testimony was an effort to support trumped up accusations of fraud where none existed."  (Pl.'s Opp'n at 34.)  First, her testimony makes clear that this recently-learned fact was not critical to her conclusion as to the falsity of the travel voucher.  (*See* Def. Ex. 32 at 226.)  Second, whether she learned after the August 20, 2003 removal decision of *yet another* reason to support the termination in no way indicates that the extensive record amassed by Smith (*see* Def. Ex. 18), and relied on by Henry, was not sufficient to justify Henry's decision.  On the contrary, the record is devoid of any evidence suggesting that Henry's decision was motivated by discriminatory animus, as opposed to the five grounds that she relied on, or that she did not "honestly believe[] in the reasons" that Smith had carefully detailed in her report.  *Fischbach*, 86 F.3d at 1183.

Finding that plaintiff has failed to provide any basis for a jury to infer that the adverse actions that he suffered were because of his race or his sex, the Court grants summary judgment on plaintiff's discrimination claims.[5]

---

[5] In his opposition, plaintiff does not address the Secretary's defense to Rountree's hostile work environment claim.  Accordingly, the Court treats that claim as conceded and dismisses it with prejudice.  *See FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997).  However, were the Court to reach it, summary judgment would in any event be granted in defendant's favor.  Plaintiff has not shown that his workplace was so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  For much the same reasons that plaintiff's discrimination claim fails -- because Rountree has not presented evidence of any discriminatory animus -- he likewise fails to show a causal connection between his race or sex and any alleged mistreatment.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 22-23 (D.D.C. 2003) ("to sustain a hostile work environment claim . . . [plaintiff] must produce

## III.    Plaintiff's Retaliation Claim

In addition to prohibiting discrimination, Title VII also forbids retaliation against an employee who has "opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]."  42 U.S.C. § 2000e-3(a).  If a plaintiff makes a prima facie showing, and defendant proffers legitimate, nonretaliatory reasons for its actions against a plaintiff, then

> the presumption of discrimination dissolves; however, the plaintiff still has the opportunity to persuade the trier of fact that the defendant's proffered reason was not the actual or sole basis for the disputed action.  The plaintiff may aim to prove that a discriminatory motive was the only basis for the employer's action, or the plaintiff may seek to show that the employer was motivated by both permissible and impermissible motives [a "mixed motives" case]. . . .

> A plaintiff asserting mixed motives must persuade the trier of fact by a preponderance of the evidence that unlawful retaliation constituted a substantial factor in the defendant's action.  When the plaintiff successfully shows that an unlawful motive was a substantial factor in the employer's action, the defendant may seek to prove in response that it would have taken the contested action even absent the discriminatory motive.  If the defendant fails to persuade the trier of fact by a preponderance of the evidence that it would have taken the action even absent the discriminatory motive, the plaintiff will prevail. . . .

> [T]he ultimate burden of persuasion as to the facts constituting the defense properly falls on the defendant in a mixed-motives case, because the plaintiff has proven that unlawful motivation constituted a substantial factor in the defendant's action. "Where a plaintiff has made this type of strong showing of illicit motivation, the factfinder is entitled to presume that the employer's discriminatory animus made a difference to the outcome, absent proof to the contrary from the employer."

---

evidence that she was discriminated against because of her [status]" (internal citation and quotation marks omitted)).

*Thomas*, 131 F.3d at 202-03 (citations omitted) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989) (O'Connor, J., concurring)).

Moreover, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Plaintiff has done that here. Rountree "assisted, or participated in any manner" in a Title VII proceeding by supporting Princess Prince in her EEO complaint against Newbill. (*See, e.g.*, Def.'s Ex. 2 at 236, 238-39 (Rountree's sworn 5/7/02 EEO affidavit); *see also id*. (Rountree 11/15/01 letter to Newbill, calling Prince's termination "disturbing and questionable," and implying that Newbill had subjected Rountree and his staff to "undue harassment or a hostile working environment").) Rountree's submissions in support of Prince demonstrate a sufficient familiarity with the particular facts of her work performance and the circumstances of her termination that this Court, reading the facts in the light most favorable to plaintiff, lacks any basis upon which to accept defendant's argument that Rountree lacked "a good faith, reasonable belief that the challenged practice violates Title VII." *Parker v. Baltimore & Ohio R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981). Accordingly, plaintiff's support of Prince's EEO activities was "protected activity" for Title VII purposes.

Further, Newbill admitted during his deposition that he was aware Prince had filed a discrimination complaint, that Rountree had supported her in filing that complaint, and that this support caused Newbill "to lose confidence in [Rountree]." (Pl.'s Ex. 1 at 94-95.) "I do not think that [Rountree] should have worked against me or his employer in assisting a terminated employee in filing a complaint against his employer." (*Id.*) Based on this admission, a

20

reasonable jury could conclude that Newbill retaliated against Rountree because of plaintiff's

Title VII protected activity, and that plaintiff's August 20, 2002 detail was causally linked to

Rountree's filing of a sworn statement in support of Prince's complaint on May 7, 2002.  (Def.'s

Ex. 2 at 239.)

Although defendant argues that it acted against Rountree for legitimate reasons, "[a]

plaintiff may always prove a claim of [retaliation] by introducing direct evidence of [retaliatory]

intent."  *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000).  *See also Forman v. Small*, 271

F.3d 285, 300 (D.C. Cir. 2001) (holding that an official's failure to forward a complaint letter on

the basis that plaintiff had filed an EEO complaint was direct evidence of retaliation).  In contrast

to plaintiff's allegations of discriminatory animus against Newbill, the record reveals a question

of fact for a jury about whether a retaliatory motive played a role in Newbill's detail of Rountree.

*See Thomas*, 131 F.3d at 203 ("If the defendant fails to persuade the trier of fact by a

preponderance of the evidence that it would have taken the action even absent the discriminatory

motive, the plaintiff will prevail.").  The Court cannot determine whether, even absent a

retaliatory animus, plaintiff's alleged poor treatment of his subordinates and of customers (*see*

Def.'s Ex. 9 (Newbill's letter detailing reasons for proposed demotion and involuntary detail of

Rountree)) would have led to Rountree's involuntary detail.  *See George*, 407 F.3d at 410 ("'at

the summary judgment stage the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial'")

(quoting *Liberty Lobby*, 477 U.S. at 249).

Further, because Newbill initiated and provided the framework for the termination

proceeding (*see* Def.'s Ex. 14 (Newbill's 1/16/03 removal proposal)), a jury could reasonably

conclude that a retaliatory animus also played a role in plaintiff's removal. *See Porter v. Natsios*, 414 F.3d 13, 2005 U.S. App. LEXIS 13123, at *14 (D.C. Cir. 2005) (holding that, pursuant to 42 U.S.C. §§ 2000e-2 and 2000e-5, a plaintiff may in a mixed motives case establish a Title VII violation "without proving that an impermissible consideration was the sole or but-for motive for the employment action").[6/] *See also Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.")

Accordingly, plaintiff has offered sufficient evidence of retaliation to preclude the granting of summary judgment.

## IV.    Plaintiff's Appeal of the MSPB Decision

Plaintiff also appeals the MSPB's decision upholding his removal.  Court review is governed by two different standards.  Rountree's affirmative defenses that he was terminated on the basis of discrimination or retaliation are reviewed *de novo*.  5 U.S.C. § 7702(e)(3).  The nondiscrimination findings of the MSPB Administrative Judge ("ALJ") are reversible only if they were arbitrary or capricious, obtained without lawful procedures, or were unsupported by substantial evidence.  5 U.S.C. § 7703(c).  *See also Barnes v. Small*, 840 F.2d 972, 979 (D.C. Cir. 1988); *Butler v. West*, 164 F.3d 634, 639 n.10 (D.C. Cir. 1999).  Insofar as the ALJ's findings are based upon credibility assessments, these are "virtually unreviewable;" and a

---

[6/] In contrast, although the investigation of voucher fraud was instigated by Newbill, plaintiff's subsequent arrest and short-lived prosecution at the behest of the OIG Special Agent cannot be causally linked to any retaliatory animus.  Unlike the detail and the termination, both of which Newbill directly instigated, plaintiff has presented no such evidence tying Newbill to the arrest that came as a consequence solely of the OIG's independent investigation.  (*See* Def.'s Ex. 28.)

plaintiff's *de facto* request for the Court to "re-weigh conflicting evidence" is inconsistent with the reviewing court's function. *See Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002). Further, in assessing whether the MSPB's ruling was supported by substantial evidence, a court is limited to determining "whether the agency . . . could fairly and reasonably find the facts that it did," and "[a]n agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks and citations omitted).

Plaintiff argues that none of the ALJ's findings and conclusions is supported by substantial evidence, save for the allegation of government credit card abuse, which plaintiff admits, although he argues that termination is too drastic a sanction for such an offense. (Pl.'s Opp'n at 38, 44.) However, the record shows that each of the MSPB findings was supported by substantial evidence.

First, as to the travel voucher fraud charge, the ALJ weighed the evidence and found Newbill and the OIG investigator to be "credible and persuasive," whereas Rountree's and Pope's (the lessor) testimony was "extremely evasive and not straightforward," "inconceivable," "implausible," and riddled with "substantial inconsistencies." (Def.'s Ex. 25 at 8-11.) Since this Court is not in a position to reevaluate the credibility of these witnesses, it must defer to the findings of the ALJ.

Further, her decision is supported by substantial evidence. Plaintiff claimed that he wanted an apartment so that he could have his family stay with him near Washington, but his lease only permitted "ONE adult[] and ZERO children" to occupy the one-bedroom basement apartment he let in Pope's residence in Woodbridge. (*Id.* at 9; Pl.'s Ex. 7 (lease).) Plaintiff and

Pope failed to produce any documentary evidence that would trace the $4500 cash supposedly paid by Rountree, notwithstanding plaintiff's claim that he got the funds by cashing his sister's life insurance policy.  (Def.'s Ex. 25 at 10.)  Pope likewise offered no explanation of what happened to the cash.  (*Id.* ("There is the marked absence of any deposit slip or any verifiable document that shows that this money ever existed, let alone changed hands.").)  A handwritten receipt from Pope acknowledging receipt of the $4500 cash (Pl.'s Ex. 8) is hardly verifiable.  (*See* Pl.'s Opp'n at 39.)  And even if it is not technically improper to pay cash for government travel where a credit card is not accepted, it is "totally implausible that [Rountree], a long term government employee and admitted frequent government traveler would consider it reasonable to pay untraceable cash for housing, especially for a non-retractable lease, when it is standard government practice to use the government issued travel card to secure housing."  (Def.'s Ex. 25 at 10.)  The OIG agent's testimony about Pope's initial statement to her that Rountree had only paid $1000 for the apartment is far more plausible than Rountree's or Pope's explanations, and Pope's subsequent contention that he was ill on the day of her visit and therefore misspoke when confronted by the "aggressive" investigator is not sufficient to call into question the substantial evidence supporting the ALJ's finding that Rountree "knowingly filed a fraudulent travel voucher with the intent to collect money from the agency to which he was not entitled."  (*Id.* at 11.)

The ALJ likewise found that Rountree created the appearance of giving preferential treatment to Prince.  She relied on the testimony of several of Rountree's subordinates, as well as plaintiff's admission or failure to deny the statements and actions attributed to him.  She found that plaintiff took Prince offsite alone, purportedly to discuss her work, credited her explanations

rather than those of more seasoned employees, and held a meeting after Prince's termination in which Rountree implied that other employees would get their comeuppance for their role in her removal. (*Id.* at 18-19.) Moreover, she found that plaintiff behaved inappropriately in taking these actions, because as an experienced manager, he surely knew that such actions would create an appearance of preferential treatment that would disrupt the workplace and potentially undermine public and employee confidence in the integrity of government officials. (*Id.* (citing *McIntire v. FEMA*, 55 M.S.P.R. 578, 588 (1992).) This finding is also supported by substantial, largely undisputed evidence.

Next, the ALJ found that Rountree created a tense and uncomfortable work environment where he would "routinely get[] angry, feel[] and act[] betrayed, get[] a "wild look in his eye," act[] inconsistently, refuse[] to consider employee comments, pit[] one employee against another and subject[] his employees to abusive conversation." (*Id.* at 22.) She relied on the testimony of numerous subordinates, including Michaels, Fulcher, Barbrow, and Tucker, all of whom uniformly described an abusive workplace. Rountree contended that the subordinates did not actually feel abused, but rather were simply trying to curry favor with Newbill; he further argued that he never actually disciplined any employee, and he denied that he acted in the fashion the witnesses characterized. (*Id.*) However, the ALJ reasonably determined that plaintiff's "self-serving denial" lacked credibility and was uncorroborated, and instead, she properly credited the subordinates' testimony.

As for plaintiff's deficient service to members of the public, the ALJ likewise substantiated this charge. She relied on the letters of two members of the public, one of whom also testified at the hearing. These customers claimed that Rountree acted in a "heavy handed

and bureaucratic fashion," and that he told them they could not contact higher authorities or otherwise challenge his decisions or treatment of them. (*Id.* at 16-17.) The ALJ concluded that, whether the customers had in fact received all the administrative process they were due, was beside the point (*see also* Pl.'s Opp'n at 40 (focusing on the inconsequential detail of whether Rountree was responsible for a missed meeting with one of the complainants)); she held that "treating members of the public in such a fashion is a priori deficient service to them." (Def.'s Ex. 25 at 17.) She further concluded that, notwithstanding letters from customers who vouched for Rountree, the two public complaints about inappropriate conduct were credible, particularly in light of the similar treatment that plaintiff exhibited towards his subordinates. (*Id.*) The portions of the record that plaintiff now cites for the proposition that "all the testimony, both by Mr. Rountree and by his staff, demonstrated a commitment to give good service" to the complainants, actually demonstrates only that Rountree's subordinates provided the customers with the official process they were do, but other than Rountree's self-serving statements, fails to contradict the customers' assertions that they were treated rudely and inappropriately by the plaintiff. (*See* Pl.'s Opp'n at 40-41.) Thus, this conclusion of the ALJ is likewise supported by substantial evidence.

Finally, the ALJ found that Rountree had misused his government credit card. Plaintiff does not dispute that the card was misused, but in his opposition he attributes that misuse to his wife's inadvertent use of the card. (Pl.'s Opp'n at 41-43.) However, plaintiff's characterization is inaccurate, for plaintiff acknowledged at the MSPB hearing that, in addition to his wife's occasional use of the card, he likewise used the card while on sick leave and on other unapproved occasions. (*See, e.g.*, Def.'s Ex. 33 at 133-34, 214 (discussing Rountree's trip to North Carolina,

where he used the card while on sick leave, although he claimed that he was there for a meeting

for which he never claimed any hours of work)).  In light of this concession, as well as evidence

in the record of countless charges that were not work-related, the ALJ's finding that "none of the

charges incurred on [Rountree's] card during the relevant period were incurred for official travel"

(Def.'s Ex. 25 at 15) is supported by substantial evidence.

However, plaintiff contends that the ALJ committed reversible error when she refused to

permit Rountree's wife to testify about her use of the card.  He submits that she would have

"corroborated his lack of intent" to misuse the card.  (Pl.'s Opp'n at 41-42.)  The ALJ refused to

allow her to testify, characterizing her testimony, as well as other proposed witnesses, "as

irrelevant to the issue or as redundant."  (Pl.'s Ex. 25 at 6.)  Plaintiff cites cases for the

proposition that a witness who offers testimony "material to the crucial issue of intent" must be

admitted.  (*See* Pl.'s Opp'n at 42 (citing *Wright v. United States Postal Serv.*, 183 F.3d 1328,

1333 (Fed. Cir. 1999); *Jones v. Dep't of Army*, 68 M.S.P.R. 398, 405-07 (1995); *Burge v. Dep't

of Air Force*, 82 M.S.P.R. 75, 92 (1999).)  However, these cases are fact specific; they certainly

do not stand for the proposition that all witnesses who may add some additional detail need be

allowed to testify.  On the contrary, just as district courts enjoy broad discretion to exclude

evidence, the probative value of which is substantially outweighed by "considerations of undue

delay, waste of time, or needless presentation of cumulative evidence," Fed. R. Evid. 403; *see

also United States v. Tarantino*, 846 F.2d 1384, 1410 (D.C. Cir. 1988) (holding that a district

court did not abuse its discretion in excluding the testimony of a witness that was not highly

probative), the MSPB also enjoys substantial discretion to decide evidentiary issues such as the

admissibility of witness testimony.  *See, e.g.*, *Louie v. Dep't of the Treasury*, 122 Fed. Appx.

449, 451 (Fed. Cir. 2004) (applying an abuse of discretion standard; "[i]f an abuse of discretion did occur, in order to prevail [plaintiff] must also prove that he was prejudiced by the error such that it could have affected the outcome of his case").  Plaintiff's wife had already submitted a letter explaining that "on several occasions and without his knowledge, I did in fact use my husband's . . . government credit card . . . .  My use of his government credit card was unintentional . . . ."  (Pl.'s Ex. 21.)  Moreover, Rountree testified to the same effect.  (Def.'s Ex. 33 at 134-35.)  Thus, his wife's testimony would have been merely cumulative, and the ALJ therefore did not abuse her discretion in excluding it.  Further, since plaintiff's wife was not the only one who misused the card, her testimony could not shed any light on the "crucial issue" of her husband's intent when he used the card in violation of agency policy.  (*See* Pl.'s Ex. 14 (setting forth rules for card usage, including that "[t]he card shall not be stored or kept by anyone other than the employee").)  Accordingly, the ALJ did not commit error by excluding the testimony of plaintiff's wife.

In light of each of these findings, the ALJ acted properly in affirming Rountree's removal.  Employing the *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (1981), factors, she properly concluded that the nature and seriousness of these offenses justified plaintiff's termination.  (*See* Def.'s Ex. 25 at 28.)  The evidence was more than sufficient to sustain her findings that plaintiff was an abusive boss who created a hostile work environment, treated members of the public irresponsibly, misused his credit card, committed voucher fraud, and favored a subordinate employee.  All of these findings are supported by substantial evidence, and plaintiff points to no procedural defect that requires reversal.  Thus, the Court affirms the non-discrimination findings of the ALJ.  Further, as this Court has already concluded that plaintiff's

discrimination claim fails, the MSPB's rejection of that affirmative defense is likewise upheld. (*See id.* at 23-25.)

However, applying a *de novo* standard of review, the ALJ's finding that plaintiff was not the subject of retaliation must be reversed.  On the record before this Court, a jury could fairly conclude that plaintiff's removal was motivated, at least in part, by his having engaged in protected EEO activity.  Therefore, plaintiff will be entitled to argue at trial that, notwithstanding all the abuses found by the ALJ, retaliation was nonetheless a factor in his termination.  *See Porter*, 2005 U.S. App. LEXIS 13123, at *14.


**CONCLUSION**

Accordingly, defendant's motion for summary judgment is granted as to plaintiff's discrimination and hostile work environment claims and denied as to his retaliation claim. Further, the March 26, 2004 MSPB decision is affirmed in part and reversed in part.

An appropriate Order accompanies this Memorandum Opinion.


_____
            s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  August 11, 2005